Anthony GUIDE, Plaintiff,

v.

Sam DESPERAK and Joseph Roschko, individually and as co-partners doing business under the firm name and style of Advance Sewing Machine Company, Defendants.

Anthony GUIDE, Plaintiff,

v.

ADVANCE SPIRAL MACHINE COMPANY, Inc., Defendant.

United States District Court
S. D. New York.
Aug. 30, 1956.

Harry W. F. Glemser, Bacon & Thomas, Washington, D. C., for plaintiff. Harvey W. Mortimer, New York City, of counsel.

Samuel J. Stoll, Jamaica, N. Y., for defendants.

DAWSON, District Judge.

### Nature of the actions

These are two actions alleging patent infringment and unfair competition which have been consolidated for trial. Both actions are based upon patent No. 2,674,963 issued to the plaintiff on April 13, 1954 entitled "Spiral Seam Producing Mechanism for Sewing Machines". The defendants in both actions have pleaded that plaintiff's patent is invalid, and the individual defendants have counterclaimed for a judgment that the patent in suit be declared invalid. The individual defendant Roschko also filed a counterclaim in which he asked that the plaintiff be fined for marking the word "patented" upon his sewing machines or using the word in connection with advertising of the spiral sewing attachment prior to April 13, 1954, the date upon which the patent was issued.

### The patent in suit

The patent has sixteen claims. However, counsel for the plaintiff agreed to limit his assertion of infringement to claims 1, 2, 3, 6, 7, 12 and 14.

The patent relates to a mechanism to be used with a sewing machine by which spiral seams may be sewn on hemispherically constructed forms of work, such as brassiere cups. It is admitted that brassiere cups reinforced with spiral seams are not new. Nor is novelty claimed for combining a sewing machine with an attachment stitching fabric forms, such as brassiere cups, with a continuous spiral seam.

The patent issued to W. T. Gensheimer, on May 1, 1951, No. 2,551,261, for a "spiral stitching machine" covers a sewing machine attachment by which precut circular material in flat form is sewn together by spiral stitching; thereafter, a sector is cut from the circular element so as to permit it to be given a cone shaped form for use as a brassiere cup. There are many other prior patents which involve spiral stitching attachments for sewing machines.[1]

Plaintiff contends, however, that the unique feature of his patent is that it will sew a spiral seam in a "hemispherical cup" or "somewhat spherically shaped work". His expert witness stated that in

---

1. Among these are:
   Cornelius Weiss—No. 1,259,324, dated March 12, 1918

   Analdo M. English—No. 1,463,116, dated July 24, 1923
   Irving Sutker—No. 2,437,624, dated March 9, 1948

the Gensheimer patent, the work was placed flat and under a bar and that if a preformed brassiere cup were used in the Gensheimer attachment, it would gather and wrinkle. He stated that in the Guide patent, the work is held in place by a pin piercing the center of the work and that coming over the pin is a U-shaped member, so that the cup is free to revolve about the pin; and that the U-shaped member is sufficiently high to allow the sides of the spherical cup to revolve without coming in contact with it.

The expert witness for the plaintiff stated that this method of holding the cup so that it was free to rotate was the only "invention" in the patent.[2]

### Discussion

Whether the U-shaped member is an "invention" within the meaning of § 103 of the Patent Act, 35 U.S.C.A. § 103, or is merely an innovation "obvious to a person having ordinary skill in the art" may well be open to question.[3]

However, it is not necessary to decide that question for the patent itself fails to comply with § 112 of the Patent Code, 35 U.S.C.A. § 112, which provides, in part:

> "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

■ Failure to comply with this provision of the Code is a defense to an action for infringement if it is pleaded.[4] It was pleaded in the present case.

The transcript in the present case shows a constant effort to ascertain from the plaintiff a statement of what he considered his invention to be. Finally, the "invention" came down to the U-shaped member; all other elements of the combination were admittedly old in the art. Instead of a flat work holder as provided in the Gensheimer patent, the invention in the patent was only the U-shaped holder about which a hemispherical work piece could rotate.

But the patent in suit did not distinctly claim this element as the invention. Of the sixteen claims in the patent, only two claims (Nos. 14 and 15) even refer to

---

2. "The Court: The sewing of the cup isn't the invention? The levers, the cam, are not the invention?

   "The Witness: It is the work support.

   "The Court: It is the work support.

   "The Witness: In connection with the sewing.

   \*    \*    \*    \*    \*

   "The Court: I understand, but the validity of the patent as an invention depends solely upon the U-shaped arm or an arm which engages the pin?

   "The Witness: Your Honor, that is my opinion, that that is an essential ingredient, together with these other things.

   "The Court: Now, if that is not an invention, nothing about the rest of the machine is an invention?

   "The Witness: That is my feeling, your Honor.

   \*    \*    \*    \*    \*

   "Mr. Mortimer: But Gensheimer does not show sewing on a hemispherical body, and the witness has testified that Gensheimer does not work on a hemispherical body.

   "The Court: Aside from the fact that it does not sew on a hemispherical body, it covers the invention, doesn't it, everything else?

   "Mr. Mortimer: No, sir, because it does not show the kind of way of holding the work on the pin so that a hemisphere or a half of a ball could rotate. It stops it, instead of permitting it. Aside from that, it does show other elements of the machine.

   "The Court: But the fact that it operates on a worm, rather than a cam, does not make any difference?

   "Mr. Mortimer: I don't believe that makes the slightest bit of difference.

   "The Court: Again, we come back to the question of the U-shaped bar or whatever it is which holds the hemispherical body in place? That is really what we come down to.

   "Mr. Mortimer: Which is nowhere shown in the prior art."

3. See Welsh Manufacturing Company v. Sunware Products Co., 2 Cir., 236 F.2d 225.

4. § 282(3) of the Patent Code, 35 U.S.C.A. § 282(3).

this element, and not even these claims designate this element as the invention.[5]

As far back as 1822, Mr. Justice Story, in the leading case of Evans v. Eaton, 7 Wheat. 356, at pages 430, 431, 20 U.S. 356, at pages 430, 431, 5 L.Ed. 472, said:

"From this enumeration of the provisions of the act, it is clear that the party cannot entitle himself to a patent for more than his own invention; and if his patent includes things before known, or before in use, as his invention, he is not entitled to recover, for his patent is broader than his invention. If, therefore, the patent be for the whole of a machine, the party can maintain a title to it only by establishing that it is substantially new in its structure and mode of operation. If the same combinations existed before in machines of the same nature, up to a certain point, and the party's invention consists in adding some new machinery, or some improved mode of operation, to the old, the patent should be limited to such improvement, for if it includes the whole machinery, it includes more than his invention, and therefore cannot be supported."

Through the years, this principle has been applied by the courts. Thus, if a patent for a combination claimed more than the applicant invented, the patent was held void. Lincoln Engineering Co., of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008. In declaring a product patent relating to carbon black invalid in 1942, the United States Supreme Court said:

"The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine." United Carbon Co. v. Binney Co., 1942, 317 U.S. 228, at page 236, 63 S.Ct. 165, at page 170, 87 L.Ed. 232.

---

5. These claims read as follows:
"14. The combination with a sewing machine having stitching mechanism including a needle, a presser foot and work feeder and driving means therefor, of means for guiding the work laterally relative to the direction of the forward feed produced by the stitching mechanism at a progressively varying rate, comprising a laterally shiftable work support member; means carried by said work support member including a generally U-shaped holder member; a work-piercing needle mounted upon one of said members for pivotally supporting a work piece for free rotation relative to said members, said holder member having a portion of one of its legs adjacent the work supporting member substantially in alignment with said needle and cooperating with said work supporting member for maintaining a work piece in place; means pivotally mounting said holder member on said work support member; means for shifting said work support member laterally comprising a cam having a spirally formed portion and being mounted for rotary motion about a relatively fixed axis; driving connections between said cam and the driving means of the machine for rotating the cam in timed relation with the operation of the stitching mechanism of the machine; and means engaging and responsive to the varying contour of said cam and engaging said work support member for shifting said work support member laterally at a rate coordinated with the rate of forward feed, whereby to produce a seam in the work piece in the form of a spiral.
"15. The combination of claim 14, including a generally U-shaped guide shield having a portion adapted to be positioned adjacent the needle of said stitching mechanism and further adapted to be positioned inside a cup-like work piece to hold the cup open and to facilitate rotary motion thereof by the feeder; and means pivotally supporting said guide shield for pivotal movement relative to said feeder."

See also General Electric Co. v. Wabash Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402.

■ A patent purports to be a grant by the government. When issued, it has a presumption of validity. 35 U.S.C. § 282. But this presumption is based upon the premise that the Patent Office makes certain that the provisions of the law are complied with, that the prior art has been searched to see that the patent in fact is limited to the new "invention", and that the claim distinctly points out the subject matter which the applicant regards as his invention. What do we find in this case?

A study of the file wrapper—the proceedings in the Patent Office—shows a failure on the part of the Patent Office to require compliance with the law or to make an adequate search of the prior art. The Gensheimer patent is not even referred to in the Patent Office proceedings. There was no insistence by the Patent Office that the applicant comply with the provisions of § 112 by stating in the claims the "subject matter which the applicant regards as his invention." Instead, claims were allowed in language of such generality that the patent, because of its very breadth, could become a weapon to deter other persons, on threat of infringement actions, from building or using machines which in no way involved the slight improvement which the applicant now, at long last, concedes was his only "invention". The purpose of § 112 is to require that the "invention", as distinguished from prior art, shall be stated distinctly and precisely so that the limits of the patent may be apparent to all and so the patent may not be used as a cloak to cover matter which is not the invention.[6] This precise provision of the Code was ignored by the Patent Office in granting this patent.

The claims of the patent in suit include claims for matters which were obviously covered in the prior art and matters which were even covered by previous patents, and in no way attempt to limit the boundaries of the patent to the invention which the inventor now asserts. It is patents of this type that create needless litigation with useless expense, clog the court calendars, and impede the true progress of the arts.

Why patent claims in their present form were allowed by the Patent Office must remain a cause for wonderment. Mr. Justice Douglas, in referring to a patent then before the Supreme Court, referred to it as one of the "incredible patents which the Patent Office has spawned", and pointed out:

"The Patent Office, like most administrative agencies, has looked with favor on the opportunity which the exercise of discretion affords to expand its own jurisdiction. And so it has placed a host of gadgets under the armour of patents—gadgets that obviously have had no place in the constitutional scheme of advancing scientific knowledge." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 156, 71 S.Ct. 127, 132, 95 L.Ed. 162.

It may be that it is because of this looseness in applying the standards of the Patent Code that the cynic now all too frequently can say: "A patent is merely a license to bring a lawsuit." This is a negation of the very principles of our Patent Law which presuppose that a patent is a solemn grant allowed by the government only after strict search and careful attention to the precise requirements of the Patent Code.

---

6. Mr. Justice Story, in Evans v. Eaton, supra, expressed this thought in the following language:

"It is, therefore, for the purpose of warning an innocent purchaser or other person using a machine, of his infringement of the patent; and at the same time of taking from the inventor the means of practicing upon the credulity or the fears of other persons, by pretending that his invention is more than what it really is, or different from its ostensible objects, that the patentee is required to distinguish his invention in his specification." 7 Wheat. at page 434.

However, the cynics may have some justification when we consider how many patents granted by the Patent Office are invalidated when they reach the courts. A statistical study was presented at the hearings before the Senate Committee on Patents, Trademarks, and Copyrights, 84th Cong., 1st Sess. (1955) prepared by Mr. P. J. Federico of the Patent Office. These data show that in the seven year period from 1948 to 1954, 53% of all patents which were contested before the District Courts were held invalid and 63% of all patents which were contested before the Courts of Appeals were held invalid. See Frost, Patent Office Performance in Perspective, 54 Mich.Law Rev. 591, n. 3 (1956). This would seem to indicate that the Patent Office continues to spawn patents with little regard for the standards laid down by the Courts in interpreting the Patent Code. How long, it may be asked, would a title company survive if over 50% of all titles guaranteed by it were held defective when they reached a test in Court? How long could a lawyer expect to retain clients or receive professional acceptance if over 50% of all the opinions which he rendered were declared wrong when they reached the test of Court proceedings? And yet this, it appears, has been the record of the Patent Office. If so, it is unfair both to those who are issued patents and those who bear the burden of defending infringement actions. It is equally unfair to the Courts.

It may be that if the Patent Office were alert to require compliance with § 112 of the Patent Code, it would not "spawn" so many patents of doubtful validity for the scope of the asserted invention would first have to be defined with precision, thereby making easier the search of the prior art and a determination as to whether the claim does qualify as an invention.

■ The patent has failed to comply with the provisions of § 112 of the Patent Code and is therefore void.

### The counterclaims

■ Insofar as one of the defendants seeks, by a counterclaim, to impose a penalty upon the plaintiff for using the word "patented" on his machines or in his advertising before the date on which the patent was issued, the evidence in the case is not sufficient to warrant the imposition of this penalty. Such a penalty is provided in § 292 of the Patent Code, 35 U.S.C.A. § 292, when the word "patented" is put upon any work "for the purpose of deceiving the public". The testimony showed that the advertisements bearing the word "patented" were placed by a licensee of the plaintiff by mistake while the application for the patent was pending but after plaintiff had received notice from his patent attorney that certain claims had been allowed. The plaintiff testified that he thought that the allowance of the claims was sufficient to indicate allowance of the patent and that he had a right to advertise that his machine was patented. Later, upon consulting his patent attorney, and when he learned that his patent had not been granted, he caused his licensee to take the word "patented" out of its advertisements. It does not appear to the Court that the actions complained of were done with the intent of deceiving the public, but rather were done by a layman as a result of a mistaken understanding of the law. Under such circumstances, the imposition of the penalty would be improper. Calderwood v. Mansfield, D.C.N.D.Cal.1947, 71 F. Supp. 480; Connecticut Tel. & Elec. Co. v. Automotive Equipment Co., D.C.D.N.J. 1926, 14 F.2d 957, affirmed 3 Cir., 1927, 19 F.2d 990.

### Findings

The Court finds that the only invention, if it be an invention, made by the plaintiff was the addition of a U-shaped holder for holding the work piece on the sewing machine.

The Court finds that the claims of the patent did not point out and distinctly claim the subject matter which the applicant regarded as his invention and that, therefore, the patent failed to com-

ply with the requirements of § 112 of the Patent Code.

The Court concludes that the patent in suit is void.

The Court further concludes that the counterclaim seeking a penalty against the plaintiff for placing a marking upon his product or in advertisements indicating that his patent had been granted was not done with the intent of deceiving the public; and that, therefore, this counterclaim should be dismissed.

The Court finds that no evidence of unfair competition by the defendants was offered by the plaintiff.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Let judgment be entered accordingly.